IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SAUCON VALLEY MANOR, INC.,      :
NIMITA KAPOOR-ATIYEH,      :
     :
         Plaintiff,      :          CIVIL ACTION NO. 17-2568
     :
     v.      :
     :
TERESA MILLER, JACQUELINE ROWE,      :
MATT JONES, MICHELE      :
MOSKALCZYK, AT HOME, INC. d/b/a      :
AT HOME HEALTH SERVICE and AT      :
HOME HEALTH AND HOSPICE, and      :
PATRICK R. STONICH,      :
     :
         Defendants.      :

## <u>MEMORANDUM OPINION</u>

Smith, J.          June 6, 2019

In late 2014, emergency room staff raised concerns of caregiver neglect after they treated an elderly resident of the plaintiffs' personal care home. The Pennsylvania Department of Human Services ("DHS") received a report about this claim of neglect and, thereafter, investigated the personal care home. This investigation culminated in DHS identifying several violations and temporarily revoking the plaintiffs' "regular" personal care home license. The plaintiffs—displeased with DHS's investigation, including that it involved complaints brought to DHS's attention by a competitor—brought the instant civil action under 42 U.S.C. § 1983 alleging that the DHS parties and the plaintiffs' competitor violated their federal civil rights. Specifically, the plaintiffs alleged that the DHS parties denied them procedural and substantive due process in violation of the Due Process Clause, violated the Equal Protection Clause by conducting a biased investigation, and used the investigation to retaliate against them in violation of the First

Amendment. The plaintiffs also alleged that DHS employees conspired with the plaintiffs' competitor to deprive them of their "regular" license.

After a lengthy period of discovery, the defendants separately moved for summary judgment and said motions are currently before the court. While the defendants raised numerous arguments as to why all the plaintiffs' claims fail as a matter of law, the court grants the competitor's motion in total, and grants summary judgment in favor of the DHS parties as to the plaintiffs' claims for violations of procedural due process (denial of a predeprivation hearing and bias only), substantive due process, and equal protection. The court denies the DHS parties' motion for summary judgment as to the claim that the DHS parties denied the plaintiffs postdeprivation process due to delay and the claim for First Amendment retaliation. Lastly, as to all defendants, the court grants summary judgment in their favor on the plaintiffs' section 1983 civil conspiracy claim.

## I.     PROCEDURAL HISTORY

The plaintiffs, Saucon Valley Manor, Inc. and Nimita Kapoor-Atiyeh ("Atiyeh"), filed a complaint against Theodore Dallas ("Dallas") in his official capacity as the Secretary of the DHS,[1] Jacqueline Rowe ("Rowe") in her official capacity as the Director of the Bureau of Human Services Licensing ("BHSL") of the DHS's Office of Administration, Matt Jones ("Jones") in his individual and official capacity as a DHS representative, Michele Moskalczyk ("Moskalczyk") in her individual and official capacity as licensing administrator in the Northeast Region Office of the BHSL, and At Home, Inc. d/b/a At Home Health Service and At Home Health and Hospice,

---

[1]April 16, 2018, the parties dismissed Dallas and substituted his successor, Teresa Miller ("Miller"), as a defendant by agreement. Doc. No. 42.

and Patrick Stonich ("Stonich") on June 7, 2017.[2] Doc. No. 1. The complaint asserted four causes of action under section 1983: (1) violations of the Fourteenth Amendment Due Process Clause against the DHS Defendants; (2) violations of the Fourteenth Amendment Equal Protection Clause against the DHS Defendants; (3) First Amendment retaliation against Jones and Moskalczyk; and (4) civil conspiracy against the At Home Defendants, Jones, and Moskalczyk. Compl. at 15–18, Doc. No. 1. The At Home Defendants and the DHS Defendants separately moved to dismiss the complaint on July 5, 2017, and July 27, 2017, respectively. Doc. Nos. 11, 14. On September 8, 2017, the court heard oral argument on the motions. Doc. No. 18. On January 10, 2018, the court denied the motions to dismiss in their entirety. Doc. No. 21.

In February 2018, the At Home Defendants and the DHS Defendants separately filed answers and affirmative defenses to the complaint and the case proceeded through a lengthy period of discovery.[3] Doc. Nos. 28, 29. On February 19, 2019, the DHS Defendants and At Home Defendants separately moved for summary judgment, filed statements of undisputed material facts, and submitted exhibits in support of the motions. Doc. Nos. 87–90, 92–93. The plaintiffs filed responses in opposition to the motions, responses to the plaintiffs' statements of undisputed material facts, their own statements of additional facts, and exhibits in support of their opposition on March 20, 2019. Doc. Nos. 96–100, 103–10. The At Home Defendants and DHS Defendants separately filed responses to the plaintiffs' opposition to their motions for summary judgment on

---

[2] The court collectively refers to Dallas, Rowe, Jones, and Moskalczyk as the "DHS Defendants." The court collectively refers to Stonich and At Home, Inc. d/b/a At Home Health Service and At Home Health and Hospice as the "At Home Defendants."

[3] The At Home Defendants also asserted three counterclaims against the plaintiffs: two counts of tortious interference with contractual relationships and one claim for unfair competition. Answer of Defs. At Home, Inc., d/b/a At Home Health Service, At Home Health and Hospice and Patrick R. Stonich, to Pls.' Compl. with Affirmative Defenses and Counterclaim at 13–16, Doc. No. 29. On April 4, 2018, the plaintiffs moved to dismiss these counterclaims. Doc. No. 36. On April 17, 2018, the At Home Defendants moved to withdraw their counterclaims, and the court granted the motion. Doc. Nos. 40, 41.

April 3, 2019. Doc. Nos. 112–14. After receiving the court's permission, the plaintiffs filed a sur-reply brief on April 10, 2019. Doc. No. 116.

The motions for summary judgment are ripe for disposition.

## II.    DISCUSSION

### A.    <u>Standard of Review – Motions for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party

asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute"). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (indicating that party opposing motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor"). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Thus, it is not enough to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d

180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted). Nonetheless, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe it," the court should not take those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B.     Undisputed Material Facts

### 1.     Underlying Incident Giving Rise to the License Revocation

Saucon Valley Manor, Inc. operates a personal care home known as "Saucon Valley Manor."[4] Pls.' Unredacted Resp. to the DHS Defs.' Statement of Undisputed Facts at ¶ 6 ("Pls.' Resp. to DHS Facts"), Doc. No. 107; *see* 62 P.S. § 1001 (defining "Personal care home" as any premises in which food, shelter and personal assistance or supervision are provided for a period exceeding twenty-four hours for four or more adults who are not relatives of the operator, who do not require the services in or of a licensed long-term care facility but who do require assistance or supervision in such matters as dressing, bathing, diet, financial management, evacuation of a residence in the event of an emergency or medication prescribed for self administration.").[5] On

---

[4] The court collectively refers to Saucon Valley Manor, Inc. and Saucon Valley Manor as "Saucon."

[5] The plaintiffs incorporated the defendants' factual assertions into their responses to the separately filed statements of material facts; therefore, the court cites only to the plaintiffs' responses for the underlying factual assertion and the plaintiffs' response. Because the parties filed numerous documents under seal in this matter, they also filed publicly available, redacted documents. The court references the plaintiffs' sealed (and unredacted) response to the DHS Defendants' statement of facts, Doc. No. 107, and generally does so throughout the opinion where parties filed an unredacted document. The plaintiffs' filed a redacted version of their response to the DHS Defendants' statement of material facts at Doc. No. 97.

December 8, 2014, an individual residing at Saucon ("Resident #1) was admitted to St. Luke's Hospital ("St. Luke's"). Pls.' Resp. to DHS Facts at ¶ 22. After treating Resident #1, St. Luke's medical staff became concerned that caregivers neglected Resident #1. *See id.* (describing St. Luke's staff as being concerned with possible "caregiver neglect"). As a result, St. Luke's staff reported the potential neglect to the Northampton County Area Agency on Aging ("Northampton AAA"). *Id.* at ¶¶ 22, 23.

The Northampton AAA called Louis Bisignani ("Bisignani"), the Director of DHS's Northeast Regional Office, about the suspected neglect of Resident #1. *Id.* at ¶¶ 15, 23. On December 9, 2014, Bisignani notified BHSL's Northeast Regional Office's workload manager, Moskalczyk, and Anne Graziano (another DHS licensing supervisor) that DHS needed to investigate the complaint within 72 hours. *Id.* at ¶ 25. The next day, Bisignani e-mailed a "high level complaint" (also known as a "PCH Licensing Alert") to several DHS staff. *Id.* at ¶¶ 26, 27. The PCH Licensing Alert informed DHS staff that Resident #1 passed away on December 9, 2014, and that St. Luke's staff expressed concern that Saucon neglected Resident #1 due to Resident #1's "condition upon admission." *Id.* at ¶ 28; *see id.* at 29 ("Undisputed for purposes of resolving DHS's motion for summary judgment.").

While several regulatory bodies conducted investigations into Resident #1's death, DHS's responsibility was to "investigate whether there was 'neglect of a care-dependent person' such as Resident # 1 'from a regulatory perspective – not a criminal perspective." *Id.* at ¶ 30 ("Undisputed"); *see id.* at ¶ 40 (describing Northampton AAA and Hellertown Police Department as also investigating Resident #1's death). DHS does not investigate all deaths at personal care homes; however, DHS investigates "unusual deaths" and "deaths where a regulatory complaint has been made." *Id.* at ¶ 31.

Ultimately, DHS assigned Julienne Rushin ("Rushin") and Moskalczyk, as her supervisor, to investigate the complaint. *Id.* at ¶ 32. Bisignani also brought in Lori Knockstead ("Knockstead"), a consultant from Temple University's Institute on Protective Services, to assist with the investigation. *Id.* at ¶¶ 32, 33. Rushin, Moskalczyk, and Knockstead (collectively, the "Investigators") conducted their inquiry into Resident #1's treatment over the course of several months. *Id.* at ¶ 37. Their inquiry involved several site visits to Saucon and, on one such visit, Knockstead stated that Resident #1 died of a "raging UTI." *Id.* (disputing that Knockstead made statement on December 15, 2014, and asserting that she made it on December 12, 2014).

DHS's investigation continued into 2015 and culminated in the Investigators identifying several violations. *Id.* at ¶¶ 39, 46.[6] When DHS finds a violation, it must provide written notice to the personal care home. *See* 62 P.S. § 1026(a) ("Whenever the department, upon inspection or investigation, shall learn of violation of this act or of regulations adopted by the department pursuant to this act, it shall give written notice thereof to the offending person. Such notice shall require the offending person to take action to bring the facility into compliance with this act or with the relevant regulations within a specified time.").[7] In accordance with said requirements, DHS emailed Atiyeh, Saucon's president and administrator, a License Inspection Summary ("LIS") on April 15, 2015, detailing violations identified by the Inspectors on December 12, 2014; December 15, 2014; January 15, 2014; January 23, 2015; and February 18, 2015 (hereinafter, the

---

[6] The court does not describe the factual bases of the plaintiffs' claims against the At Home Defendants related to several complaints they made to DHS about conditions at Saucon because, as described *infra* in Section II.C.4, the court resolves the question of whether the At Home Defendants conspired with DHS as a matter of law and without reference to the underlying facts. The court notes that the At Home Defendants disputed their status as Saucon's "competitor." *See* Resp. of Defs.' At Home, Inc. d/b/a At Home Health Service and At Home Health and Hospice and Patrick R. Stonich, to Pls.' Statement of Additional Facts Precluding Summ. J. at 2 ("[I]t is disputed that it [At Home] 'competed' with Saucon."), Doc. No. 113. However, this fact was immaterial to the court's analysis.

[7] DHS was previously known as the "Department of Public Welfare" until the agency's name changed in 2014. *See* 62 P.S. § 103(a) ("The Department of Public Welfare shall be known as the Department of Human Services."). As such, the Human Services Code now defines "Department" as "the Department of Human Services of this Commonwealth." 62 P.S. § 102.

"April 2015 LIS").[8] *Id.* at ¶¶ 7, 46; Sealed Exs. to DHS Defs.' Statement of Undisputed Material

Facts ("Sealed DHS Ex."), Ex. 13 at ECF pp. 5–24, Doc. No. 92-6; *see also* 62 P.S. § 1026(a)

(setting forth notice of violation requirements).

The April 2015 LIS described the (1) violations identified, including the associated

regulatory provisions relevant to the identified violation and inspection(s) date(s) and (2) provided

a space for Saucon to include their "Plan of Correction" ("POC"). *See generally* Pls.' Additional

Facts Precluding Summ. J. ("Pls.' Additional Facts"), Ex. 30, Decl. of Rebecca S. Melley ("Melley

Decl."), Ex. B at ECF pp. 14–86, Doc. No. 100-29.[9] A POC is a written plan, approved by DHS

and prepared by the "legal entity," that specifies how the personal care home will "correct each

noncompliance[.]" 55 Pa. Code. § 20.52 ("If, during an inspection, authorized agents of the

Department observe items of noncompliance with licensure or approval regulations, the legal

entity shall submit an acceptable written plan to correct each noncompliance item and shall

establish an acceptable period of time to correct these items."). The personal care home must

submit a POC to DHS within ten days of a receiving a violation report. Pls' Resp. to DHS Facts at

¶ 50. In addition to identifying proposed solutions to violations, DHS uses POCs to allow parties

to document their disagreements with the underlying violations without admitting responsibility

for said violations. *See* DHS Statement of Undisputed Material Facts, Ex. 4, Office of Admin.

Bureau of Human Servs. Licensing Policies and Procedures ("DHS Policies") at 39 ("[An

individual/entity submitting a POC] may document disagreement with a finding, and/or may

document that providing a plan does not constitute admission that the listed violation is accurate.

However, [the individual/entity] must provide a plan to correct each violation in addition to

---

[8] The DHS Defendants filed the sealed exhibits to their statement of undisputed material facts at Doc. No. 92. The LIS is Exhibit 13 to DHS Defendants' statement of undisputed material facts. Doc. No. 87-13.
[9] The court refers to pages 14 through 86 of the Melley Decl. as the "2015 LIS".

statement(s) disputing the report's findings."), Doc. No. 87-4. DHS directed the plaintiffs to dispute the underlying violations in their POC via the cover letter attached to the April 2015 LIS. Sealed DHS Ex. 13 at ECF p. 5 (stating that "[i]f you believe any violation is incorrect, you may say that in your comments under Section 3 but you still must include a plan to reach and maintain compliance[]").On April 14, 2015, Saucon submitted a POC to DHS. Pls' Resp. to DHS Facts at ¶ 52. In its POC, Saucon challenged the findings of violation in Section 3 by providing written comments. 2015 LIS at ECF pp. 14–86; *see also* Pls.' Resp. to DHS Facts ¶ 53 ("By way of further response, although Saucon voluntarily submitted with its POC voluminous information rebutting DHS's 'factual findings' in the Violation Report, as it has the right to do . . . ."). On May 20, 2016, DHS rejected Saucon's POC as an "[u]nacceptable plan for regulation(s) #: 24, 42b, 141b2, 142a, 187a, 187d, 226c, 227d." *Id.* at ¶ 54; Sealed DHS Ex. 17, Doc. No. 92-9. Saucon submitted a revised POC and, on or about May 26, 2015, DHS approved the revised POC. *Id.* at ¶ 56. Notably, DHS approval of a POC allowed Saucon to continue operating during a subsequent enforcement proceeding.[10] *Id.* at ¶ 57.

On May 26, 2015, Bisignani recommended that DHS initiate an enforcement action against Saucon, *id.* at ¶ 58, specifically, he recommended a "Revocation of the Home's License and issuance of a First Provisional License." *Id.* at ¶ 59. On Bisignani's recommendation, DHS revoked Saucon's "regular" personal care home license and issued the "first provisional license" on June 9, 2015. *Id.* at ¶ 60. As required by 62 P.S. § 1026(c), DHS provided written notice of the revocation. In the notice, DHS stated that it revoked Saucon's regular license because of three Class II violations: § 2600.42(b) ("A resident may not be neglected, intimidated, physically or verbally abused, mistreated, subjected to corporal punishment or disciplined in any way."), §

---

[10] The applicable regulation requires that "[u]pon full compliance by the facility, the department shall issue a regular license immediately." 62 P.S. § 1008(d).

2600.187(b) (regarding recording of medication at the time it is administered), and § 2600.187(d) (requiring home to follow directions of prescriber). DHS Defs.' Statement of Undisputed Facts, Ex. 14 at ECF pp. 4–6 ("DHS Revocation Letter"), Doc. No. 87-14; Pls.' Resp. to DHS Facts at ¶ 62 (disputing that plaintiffs violated cited regulatory provisions, but not disputing that DHS identified said provisions as bases for violations). Saucon had five days from the mailing of the letter to correct the violations before DHS would access fines. DHS Revocation Letter at ECF p. 5. Ultimately, DHS did not issue any fines against Saucon for the identified violations and restored the plaintiffs' "regular" license three months early. Pls' Resp. to DHS Facts at ¶¶ 57, 65, 67.[11]

## 2. DHS Appeal Process

While a "legal entity" may not appeal from DHS's finding of a violation, the entity may immediately appeal from DHS's decision to revoke a "regular" license to the Bureau of Hearings and Appeals ("BHA") within DHS. *See* 55 Pa. Code §§ 20.81 (decisions that may be appealed), 20.82(a) (written request for appeal). Chapter 1, Part II of the Pennsylvania Code governs these appeals. *See* 55 Pa. Code § 2600.12 ("Appeals related to the licensure or approval of the personal care home shall be made in accordance with 1 Pa. Code Part II (relating to General Rules of Administrative Practice and Procedure).").[12] Here, the plaintiffs exercised their right to appeal the

---

[11] In September 2015, the plaintiffs requested, and were granted, an expedited license inspection. *Id.* at ¶ 67. After the expedited inspection, DHS restored Saucon's regular license three months early. *Id.*

[12] The parties did not provide record evidence regarding the mechanics of a BHA appeal, *e.g.*, who hears the case, when is a BHA decision appealable? While these facts are immaterial to the court's analysis because the plaintiffs do not dispute that postdeprivation procedures (if provided) are adequate, a brief description of the full procedural process afforded to a licensee is helpful context to the discussion below. Thus, as the court understands it, once a "legal entity" files an appeal, an Administrative Law Judge ("ALJ") is assigned to the case. *See* Jan. 2, 2018 BHA Standing Practice Order, Formal Appeals at Rule 1 (defining "Administrative Law Judge" as "[t]he Director, or an employee of the Bureau of Hearings and Appeals appointed according to statute and designated to preside at hearings or conferences or other officers specially provided for and designated to conduct specified classes of proceedings."), *available at* http://www.dhs.pa.gov/cs/groups/webcontent/documents/form/s_002109.pdf. After the BHA issues a decision (also referred to as a "recommendation"), if DHS adopts or rejects the ALJ's recommendation, a party "may seek reconsideration" by the DHS Secretary or appeal to the Pennsylvania Commonwealth Court. 1 Pa. Code § 35.226(a) (providing when adjudications of agency constitute final order); *see generally Liberty Manor Pers. Care Home v. Dep't of Pub. Welfare*, No. 979 C.D. 2014, 2015 WL 5432471, at *5 (Pa. Commw. Apr. 17, 2015) (describing process as (1) appeal proceeding to ALJ, (2) ALJ issuing a "recommendation," (3) agency adopting ALJ's recommendation,

revocation of their regular license and gave notice of their intent to appeal on June 13, 2015. 2016 LIS at ECF p. 9. DHS responded that it received the notice and forwarded it to the BHA on June 16, 2015. *Id.* at ECF p. 8. To date, the BHA proceeding is ongoing. While the BHA initially scheduled a hearing date shortly after the plaintiffs gave notice of their intent to appeal, the plaintiffs requested several continuances. Pls' Resp. to DHS Facts at ¶ 76; DHS Bureau of Hr'gs and Appeals R. at ECF pp. 4–20 ("BHA R."), Doc. No. 124. Recently, the BHA scheduled a hearing for April 30, 2019; however, at the request of plaintiffs, the BHA canceled the hearing. BHA R. at ECF p. 4. As of the last update by the parties, the BHA has scheduled a hearing for August 20, 2019, before David A. Dudley, Esq., ALJ. DHS Defs.' Supp. to Pls.' Resp. to Order of May 8, 2019 Re BHA Docket Entries at ECF p. 3 ("BHA May 2019 Order"), Doc. No. 141.

## C.    Analysis of the Plaintiffs' Section 1983 Claims

"Section 1983 provides a civil remedy for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Halsey v. Pfeiffer*, 750 F.3d 273, 290 (3d Cir. 2014) (quoting 42 U.S.C. § 1983). "To state a claim under section 1983, a plaintiff must demonstrate that 'some person has deprived him of a federal right ... [and] that the person who has

---

and (4) plaintiff deciding not to seek reconsideration and instead filing suit). If a party does not seek reconsideration by the Secretary (or seeks to appeal the Secretary's decision), then the case proceeds to the Commonwealth Court of Pennsylvania. 2 Pa. C.S. § 704. The Commonwealth Court then conducts a non-jury trial on the administrative record. *See id.* ("The court shall hear the appeal without a jury on the record certified by the Commonwealth agency."). After a hearing, the Commonwealth Court will:

> affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter A of Chapter 5 (relating to practice and procedure of Commonwealth agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may enter any order authorized by 42 Pa.C.S. § 706 (relating to disposition of appeals).

*Id.* If the Commonwealth Court reviews a Secretary's determination on reconsideration, then the court reviews the Secretary's decision for an abuse of discretion. *See Victorian Manor, LLC v. Dep't of Human Servs.*, No. 174 C.D.2015, 2015 WL 5511069, at *2 (Pa. Commw. Aug. 27, 2015) ("Initially, we note that our scope of review of an agency's decision on a reconsideration request is limited to determining whether the secretary abused his or her discretion. An abuse of discretion will only be found where the evidence shows there was fraud, bad faith, capricious action, or abuse of power." (citations omitted)).

deprived him of that right acted under color of state or territorial law.'" *Id.* (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (alteration in original)). Here, the plaintiffs bring four causes of action under section 1983 alleging violations of (1) substantive and procedural due process, (2) the Equal Protection Clause, (3) First Amendment retaliation, and (4) civil conspiracy. Both sets of defendants argue that the court should grant summary judgment in their favor on all causes of action.[13] The court first addresses the plaintiffs' substantive and procedural due process claims before turning to the plaintiffs' equal protection, First Amendment retaliation, and civil conspiracy claims.[14]

### 1.    Fourteenth Amendment Due Process

Pursuant to the Fourteenth Amendment, "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Due process protections extend to both substantive and procedural violations of the Fourteenth Amendment. *See Planned Parenthood of S.E. Pa. v. Casey*, 505 U.S. 833, 846–87 (1992) ("[I]t is settled that the due process clause of the Fourteenth Amendment applies to matters of substantive law as well as to matters of procedure." (citation and internal quotation marks omitted)). "[T]he substantive component of the Clause . . . protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Collins v. City of Harker*

---

[13] The DHS Defendants also argue that Rowe and Miller, sued in their official capacities only, are entitled to summary judgment because they were not personally involved in the alleged constitutional violations. Reply Br. in Further Supp. of DHS Defs.' Mot. for Summ. J. ("DHS Reply Br.") at 10 ("Plaintiffs identify no genuine issues of material fact concerning the roles of Defendants Miller or Rowe in the alleged violations of Plaintiffs' constitutional rights."), Doc. No. 111. The plaintiffs opposed this argument in their sur-reply. Pls.' Saucon Valley Manor, Inc., and Nimita Kapoor-Atiyeh's Sur-Reply in Opp'n to DHS Defs.' Mot. for Summ. J. ("Pls.' Sur-Reply to DHS Defs.") at 2–3, Doc. No. 116. Given that Rowe and Miller are sued only in their official capacities for purposes of ordering injunctive relief, the court declines to dismiss Rowe and Miller at this time.

[14] Saucon Valley Manor, Inc., as a corporation, is able to bring suit under section 1983 for violations of the Due Process Clause and Equal Protection Clause. *See Safeguard Mut. Ins. Co. v. Miller*, 472 F.2d 732, 733 (3d Cir. 1973) ("At the outset, we note that the plaintiffs are corporations. As such they are deemed to be persons within the meaning of the equal protection and due process clauses of the fourteenth amendment, and persons, as well, whose rights are protected by 42 U.S.C. § 1983[.]" (citations omitted)).

*Heights, Tex.*, 503 U.S. 115, 125 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Whereas the procedural component "provide[s] a guarantee of fair procedure in connection with any deprivation of life, liberty, or property by a State." *Id.* Here, the plaintiffs argue that Miller, Rowe, Jones, and Moskalczyk violated both the substantive and procedural components of the Due Process Clause. Compl. at 15. The court addresses each claim in turn.

### a.      Substantive Due Process

"[T]wo very different threads make up the fabric of substantive due process: substantive due process relating to legislative action and substantive due process relating to non-legislative action." *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 155 (3d Cir. 2018) (internal quotation marks and citation omitted). To advance a non-legislative substantive due process claim, the plaintiff must have "a protected property interest to which the Fourteenth Amendment's due process protection applies." *Id.* (citations and internal quotation marks omitted); *see also Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139–40 (3d Cir. 2000) ("To prevail on a non-legislative substantive due process claim, 'a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies.'" (citation omitted)). Whether the Fourteenth Amendment protects a property interest "depends on whether that interest is 'fundamental' under the United States Constitution." *Nicholas*, 227 F.3d at 140 (citations omitted). The category of interests that qualify as "fundamental" for purposes of substantive due process is narrower than those protected by procedural due process and "not all property interests worthy of procedural due process protection are protected by the concept of substantive due process." *Id.* (citation omitted); *see also Collins*, 503 U.S. at 125 (urging courts to exercise "judicial self-restraint" when determining whether to "expand the concept of substantive due process"). Instead, "to state a substantive due process claim, 'a plaintiff must have been

deprived of a *particular quality* of property interest.'" *Nicholas*, 227 F.3d at 140 (quoting *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 598 (3d Cir. 1995), *abrogated on other grounds by United Artists Theatre Cir., Inc. v. Twp. of Warrington, Pa.*, 316 F.3d 392 (3d Cir. 2003)). The "particular quality" is present in rights or interests that are "implicit in the concept of ordered liberty" or "deeply rooted in the Nation's history and traditions[,]" such as the "venerable common-law rights of real property ownership." *Id.* at 143. As such, "the only protected property interests . . . [the Third Circuit has] thus far deemed fundamental [have] involved ownership of real property." *Newark Cab Ass'n*, 901 F.3d at 155 (citation omitted).

Here, as a matter of first impression, the plaintiffs ask the court to expand the category of recognized property interests to include a "regular" personal care home license. The DHS Defendants argue that current Third Circuit precedent forecloses this avenue of relief to the plaintiffs because their "regular" license is not protected by the substantive component of the Due Process Clause. Br. in Supp. of DHS Defs.' Mot. for Summ. J. ("DHS Defs.' Br.") at ECF pp. 9–10, Doc. No. 90.[15] In response, the plaintiffs make several creative, yet unavailing arguments, namely that the court should deny summary judgment because (1) the plaintiffs' interest in the license is "certain and concrete" and (2) Third Circuit precedent does not preclude the court from recognizing their "regular" personal care home license as a protected property interest. Resp. of Pls. Saucon Valley Manor, Inc. and Nimita Kapoor-Atiyeh in Opp'n to the Mot. for Summ. J. of Defs. Teresa Miller, Jacqueline Rowe, Matt Jones, and Michele Moskalczyk ("Pls.' Br. in Opp'n to DHS Mot.") at 33–35, Doc. No. 96.

---

[15] The DHS Defendants' brief in support of their motion for summary judgment is included in the same document as their motion. Doc. No. 90 at ECF pp. 3–25.

Here, the court finds the plaintiffs' interest in a "regular" personal care home license is not a "fundamental property interest" protected by the United States Constitution.[16] While the plaintiffs' argue that this view is too narrow and fails to consider the "concrete" nature of their property interest, Pls.' Br. in Opp'n to DHS Mot. at 33, 34, the Third Circuit directs district courts to *narrowly* define protected rights for purposes of substantive due process. *See, e.g.*, *Newark Cab Ass'n*, 901 F.3d at 155 ("Courts have been generally reluctant to expand the scope of substantive due process protection." (citation omitted)). Under this framework, a personal care home license is not converted into a fundamental property interest merely because the plaintiffs held their "regular" license for a long period of time. *See id.* at 155–56 ("The property interest proffered to meet the substantive due process threshold here is akin to those we have previously rejected, such as the ability to earn a living and being terminated from a public job, being actively prevented

[16] Notably, the plaintiffs do not argue that the downgraded license impaired their ability to use their real property. *See generally Indep. Enters. Inc. v. Pittsburgh Water and Sewer Auth.*, 103 F.3d 1165, 1179 n.12 (3d Cir. 1997) ("Moreover, all of the cases involved zoning decisions, building permits, or other governmental permission required for some intended use of land owned by the plaintiffs, matters which were recognized in *DeBlasio*[ *v. Zoning Bd. of Adjustment for the Twp. of West Amwell*, 53 F.3d 592 (3d Cir. 1995), *abrogated on other grounds by United Artists Theatre Cir., Inc. v. Twp. of Warrington, Pa.*, 316 F.3d 392 (3d Cir. 2003),] as implicating the 'fundamental' property interest in the ownership of land." (citation omitted)). In certain circumstances, courts have found that denials of licenses and/or permits that impact the property owner's ability to use their property are protected by the Due Process Clause because said license and/or permit impacts an owner's fundamental property interest in real property ownership. *See, e.g.*, *Frompovicz v. Pa. Dep't of Envtl. Prot.*, No. 5:17-cv-2790, 2018 WL 4145039, at *5 (E.D. Pa. Aug. 30, 2018) (finding plaintiff's interest in environmental permit that allowed plaintiff to "remove and resell spring water for the bottled water industry from his property" was "protected by substantive due process because this interest concerns the use and enjoyment of real property"). Here, the provisional license, while arguably causing reputational harm to the plaintiffs' business, did not prevent the plaintiffs from using their real property or operating their facility as a personal care home. *Cf. Freidman v. Phila. Parking Auth.*, Civ. A. No. 14-6071, 2015 WL 2337288, at *7 (E.D. Pa. May 14, 2015) ("While the liberty to pursue a particular calling or occupation *is* protected, Plaintiffs do not plausibly allege that Defendants' conduct wholly deprived them of the right to participate in their chosen profession-taxi cab services. In fact, Plaintiffs admittedly have continued in this business and occupation, further undermining any claim of deprivation." (citation omitted)). Therefore, the court finds that their interest in a "regular" personal care home license does not impact their fundamental right to use their real property. *See Connection Training Servs. v. City of Phila.*, 358 F. App'x 315, 320 (3d Cir. 2009) (holding plaintiff's interest in City of Philadelphia's recognition of its training program whereby recognition would allow plaintiff to "(1) continue to place its trainees, which [the plaintiff] CTS asserts is necessary to receive future, discretionary funding from the City of Philadelphia or city-related agencies, and (2) recover the long-term fixed costs it expended in creating its training program" are not "fundamental" under Constitution because "asserted interests are analogous to the numerous interests we have declined to recognize, which rely on statutory rights or relationships with government agencies, and are not similar to the 'venerable common-law rights of real property ownership.'" (citation omitted)).

from winning city contracts in violation of a consent decree with the city, and losing contracts because a plaintiff was termed a crook by a government employee[.]" (internal citations and quotation marks omitted)). Instead, this "expectation" of holding a regular license throughout the duration of its term is analogous to the rejected "property right" of an expectation of continued municipal services in *Ransom v. Marrazzo*, 848 F.2d 398, 412 (3d Cir. 1988), because it is the nature of the interest, not the duration one holds it, that determines which interests substantive due process protects.

At bottom, Saucon's "regular" license is merely a license to operate a business without the reputational "stain" of a provisional license and neither the right to operate a business nor the property interest in a business license are "fundamental" rights or property interests protected by substantive due process. *See, e.g.*, *Wrench Tr. Sys., Inc. v. Bradley*, 340 F. App'x 812, 814, 815 (3d Cir. 2009) (finding "personal property ownership" interest in trucks and "right to engage in business" are not fundamental rights protected by substantive due process); *Piecknick v. Pennsylvania*, 36 F.3d 1250, 1262 (3d Cir. 1994) ("It is the liberty to pursue a particular calling or occupation, and not the right to a specific job, that is protected by the Fourteenth Amendment." (citation omitted)); *Fairview Ritz Corp. v. Borough of Fairview*, Civ. A. No. 9-875(JLL), 2013 WL 5946986, at *1, *12 (D.N.J. Nov. 6, 2013) (finding business certificate required to operate a "fitness center and day spa[,]" even though lack of certificate required plaintiff to shut down his business, was not "fundamental property interest" because certificate is indistinguishable from "the right to engage in business" which "is not fundamental under the Constitution[]"); *see also ABA, Inc. v. District of Columbia*, 40 F. Supp. 3d 153, 171 (D.D.C. 2014) (concluding that Department of Health converting status of plaintiffs' home health care providers' licenses to provide Medicaid services from permanent to provisional did not deprive them of a constitutionally

protected interest to give rise to due process claim because "the provisional status of the licenses does not affect Plaintiffs' ability to provide Medicaid services"). Therefore, the court grants summary judgment in favor of the DHS Defendants because the plaintiffs' "regular" personal care home license is not a fundamental property interest protected by the Fourteenth Amendment.

### b.    Procedural Due Process

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "To maintain a procedural due process claim, [a plaintiff] must show that: (1) Defendants deprived [the plaintiff] of an individual liberty interest that is encompassed within the Fourteenth Amendment's protection, and (2) the procedures Defendants made available to [the plaintiff] did not provide due process of law." *Steele v. Cicchi*, 855 F.3d 494, 507 (3d Cir. 2017) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006)).

While the parties do not dispute the first element, a protected property interest, *see* DHS Defs.' Br. at ECF p. 15 ("For purposes of this Motion, Defendants concede that Plaintiffs have a protected interest in maintaining the 'regular' personal care home license granted by DHS to Saucon."), the DHS Defendants present several arguments as to why they are entitled to summary judgment on the plaintiffs' procedural due process claims, namely that, pursuant to *Mathews*, DHS is not required to provide additional predeprivation procedures.[17] *Id.* at ECF pp. 16–19. In response, the plaintiffs argue DHS denied them due process because the DHS employees involved

---

[17] The court addresses the arguments as framed by the parties. Thus, the court analyzes whether the plaintiffs were entitled to additional procedure prior to the revocation of their "regular" license and not whether additional procedures are required before DHS issues a violation. As an aside, even if the court were to construe the plaintiffs' arguments as seeking additional procedures before DHS issues a violation, such a claim would fail for want of a protected property interest because, assuming no fines are issued, the only "deprivation" suffered at that time is reputational. *See, e.g.*, *Hill*, 455 F.3d at 236 ("Courts have subsequently clarified, however, that 'reputation alone is not an interest protected by the Due Process Clause.'" (quoting *Versarge v. Twp. of Clinton, N.J.*, 984 F.2d 1359, 1371 (3d Cir.1993)).

in the investigation were biased against the plaintiffs, DHS failed to provide the plaintiffs a predeprivation hearing to challenge the underlying violations, the DHS Defendants failed to timely adjudicate Saucon's administrative appeal, and the plaintiffs were stigmatized in connection with the revocation of the regular license. Pls.' Br. in Opp'n to DHS Mot. at 4, 20, 27, 31. The court first addresses the adequacy of DHS's procedures pursuant to *Mathews* and then analyzes the plaintiffs' ancillary claims based on bias, delay, and stigma.

### i.   Adequacy of DHS Licensure Procedures

Due process "is a flexible concept that varies with the particular situation." *Zinerman v. Burch*, 494 U.S. 113, 127 (1990). Generally, "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Id.* (citations omitted). However, a predeprivation hearing is not always required. *Id.*; *see also Pioneer Aggregates, Inc. v. Pa. Dep't of Envtl. Prot.*, 540 F. App'x 118, 126 (3d Cir. 2013) (noting that "the Supreme Court has acknowledged that due process does not always 'require[] an evidentiary hearing prior to the deprivation of some type of property interest[]'" (quoting *Mathews*, 424 U.S. at 333)). In such circumstances, "a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process."[18] *Zinerman*, 494 U.S. at 128 (citations omitted).

---

[18] Turning briefly to DHS's postdeprivation procedures, "[d]ue process does not require pre-deprivation notice and hearing where there is an adequate scheme to compensate the property owner for the deprivation." *Reichley v. Pa. Dep't of Agric.*, 427 F.3d 236, 247 (3d Cir. 2005) (citations omitted); *DeOrio v. Del. Cty.*, Civ. A. No. 08-5762, 2009 WL 2245067, at *2 (E.D. Pa. July 27, 2009) ("Only if there were no post-deprivation remedy could DeOrio prevail on a procedural due process claim."). "[W]hen a state affords a full judicial mechanism with which to challenge the administrative decision in question, the state provides adequate procedural due process." *Pioneer Aggregates, Inc.*, 540 F. App'x at 126 (internal quotation marks omitted) (quoting *DeBlasio*, 53 F.3d at 597).

Here, the DHS Defendants argue that the plaintiffs are barred from challenging the adequacy of predeprivation procedures because DHS's postdeprivation procedures satisfy due process. The BHA appeal process is a full evidentiary proceeding; counsel is permitted to represent parties, present evidence, take discovery, and use expert witnesses. *See, e.g.*, 1 Pa. Code § 31.22 (appearance by attorney), §§ 35.137–.166 (covering evidentiary rules). After the BHA process concludes, parties can appeal to the state courts. Said process more than satisfies procedural due process. *See, e.g., Town Court Nursing Ctr., Inc. v. Beal*, 586 F.2d 266, 278 (3d Cir. 1978) ("There is opportunity to submit additional evidence after notice of deficiencies is given, and the evidence upon which the recommendation of the survey team is based is disclosed fully to the provider. Moreover, the criteria used to evaluate the provider are well known in advance to the provider, and compliance is readily proved or disproved by written submission. Finally,

Examples of circumstances in which a predeprivation hearing is not required include "[w]here there is 'the necessity of quick action by the State,' or where 'providing any meaningful predeprivation process' would be impractical . . . ." *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 417 (3d Cir. 2008) (quoting *Parratt v. Taylor*, 451 U.S. 527, 539 (1981)). In light of these considerations, courts consider three factors to determine what process is required:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335 (citation omitted).

At the outset, the court must determine whether due process mandates that the DHS Defendants provide the plaintiffs with a predeprivation hearing based on the *Mathews* factors outlined above. *See Elsmere Park Club, L.P.*, 542 F.3d at 417 ("Our first task, then, is to determine whether the Town was faced with circumstances in which it was required to provide a predeprivation hearing."). As such, the court will address each *Mathews* factor in turn.

First, the court must consider the nature of the private interest affected. *Mathews*, 424 U.S. at 335. If the private interest impacts an individual's livelihood, *i.e.*, the ability to pay for "life's necessities[,]" then the nature of the private interest is high and weighs in favor of requiring a predeprivation hearing. *See Graham v. Office of Surface Mining Reclamation & Enf't*, 722 F.2d 1106, 1111 (3d Cir. 1983) (stating that fines required to be escrowed pending appeal of violation

---

review by an administrative law judge, by the Appeals Council of HEW [Department of Health, Education, Welfare], and ultimately by the federal courts, insures that the decision of the Secretary will be thoroughly examined before becoming final."); *cf. Midnight Sessions, Ltd. v. City of Phila.*, 945 F.2d 667, 680 (3d Cir. 1991) ("However, when a state affords a full judicial mechanism with which to challenge the administrative decision to deny an application for a building permit, the state provides adequate due process." (quotation marks and citation omitted)).

are unlike "a case in which the Government seeks to deprive Graham[, the plaintiff,] of funds earmarked for life's necessities"). Whereas, if a plaintiff asserts a business or a pecuniary interest less than one that impacts the ability to pay for life's necessities, then it militates against requiring the government to provide a predeprivation hearing. *See Mathews*, 424 U.S. at 340 ("Since a recipient whose benefits are terminated is awarded full retroactive relief if he ultimately prevails, his sole interest is in the uninterrupted receipt of this source of income pending final administrative decision on his claim.").

Here, the private interest affected by the official action is the interest in operating a personal care home with a "regular" license instead of a "provisional" license. The plaintiffs argue their "private interest" is "strong" because "the Commonwealth requires that license [a regular license] to operate a personal care home" and, as such, "revocation of that license could force the home to cease operations, depriving the operator of his or her livelihood." Pls.' Br. in Opp'n to DHS Mot. at 22–23. However, this is not an accurate representation of the actual interest asserted by the plaintiffs. It is undisputed that the plaintiffs received an approved POC which allowed them to continue operations after DHS revoked their regular license. Pls' Resp. to DHS Facts at ¶ 57. Thus, the actual interest asserted by these plaintiffs is an interest in operating a home without the reputational stain of a provisional license (and financial harms flowing from said reputational harm), not their livelihood. *See* Pls.' Additional Facts, Ex. 1 at 188, 189, 224 (describing harm caused by downgrade as requiring plaintiffs to offer reduced/free rent or loss of potential clients and compliance costs), Doc. No. 105. This distances the plaintiffs' interest from one which requires a predeprivation evidentiary hearing, namely an individual's livelihood, because the downgrade did not preclude the plaintiffs' ability to operate Saucon as a personal care home. *See Mathews*, 424 U.S. at 341, 342 (analyzing actual private interest asserted based on statutory

scheme and "degree of potential deprivation"). However, even if the court accepts the plaintiffs' asserted financial interest in running a personal care home, the Third Circuit has found claims of corporate financial hardship distinguishable from an at-risk individual's ability to earn a living. *Town Court Nursing Ctr., Inc.*, 586 F.2d at 277 (finding no predeprivation hearing required before Secretary decided not to renew nursing home's provider agreement because nursing home's interest in federal Medicare payments as "a corporation claiming financial hardship" was distinguishable from, and less than, "a private individual claiming physical disability"). Thus, the first *Mathews* factor weighs against requiring DHS to provide a predeprivation hearing.

Second, the court must consider the risk of erroneous deprivation. This factor,

in addition to considering the probability of error, also takes into account the consequences of error. More protective process will generally be required the more the "length or severity of the deprivation" indicate "a likelihood" that "serious loss" will accompany any mistake. *See Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 19, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978). Whether a loss is minimal enough to excuse the ordinary requirement of pre-deprivation process will depend on a variety of factors, including the hardship suffered during the deprivation and the adequacy of the available post-deprivation remedies.

*Augustin v. City of Phila.*, 897 F.3d 142, 151 (3d Cir. 2018).[19] Courts must also look to "the type of determination that must be made and the type of evidence necessary to make that determination." *Ross v. Horn*, 598 F.2d 1312, 1319 (3d Cir. 1979).[20] If the process requires rote calculations or application of facts to specifically outlined, mechanical standards, then it is less likely that due process requires a predeprivation hearing to prevent erroneous deprivation. *Mathews*, 424 U.S. at 344–45 (describing circumstances where decision-making process is

---

[19] Legal authority appears split on whether pre and postdeprivation should be hyphenated thereby making consistency difficult when quoting caselaw.
[20] *See Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 318 (M.D. Pa. 2004) (holding test employed in *Ross v. Horn*, 598 F.2d 1312 (3d Cir. 1979) to determine when a government benefit is a protected property interest was implicitly overruled by *American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40 (1999), and *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189 (2001)).

"routine" as weighing against requiring predeprivation hearing as compared to processes based primarily on credibility determinations).

In the present case, viewing the disputed facts in favor of the plaintiffs, DHS's process for reviewing complaints and issuing violations appears to err on the side of requiring greater credibility determinations than simply checking boxes. Nonetheless, this factor ultimately weighs against requiring a predeprivation hearing because the plaintiffs' asserted deprivation is slight, and the risk of erroneous deprivation is lessened by internal review procedures and adequate postdeprivation procedures.

The deprivation here, even if erroneous, is not severe. Notably, it is undisputed that DHS did not prevent the plaintiffs from operating their personal care home with a provisional license and DHS permitted the plaintiffs to seek an expedited re-issuance of a "regular" license. It is also undisputed that DHS did not assess any fines against the plaintiffs thereby further reducing the severity of the deprivation. *See* Pls.' Resp. to DHS Facts at ¶ 65 (stating it is "undisputed" that "[n]o fines were assessed by DHS against Saucon in relation to the June 9, 2015 license downgrade[]").[21] *Cf. Augustin*, 897 F.3d at 151 (finding no predeprivation hearing required before imposing utility lien, in part, because "[u]nder most circumstances, an erroneously filed lien can be fully remedied by a post-filing hearing and an order removing the encumbrance[]").[22] Thus,

---

[21] If DHS assesses a fine against a personal care home, it collects the fines and places the funds into escrow pending the appeal. *See* 55 Pa. Code § 2600.263(a) (addressing appeals from penalties). The issuance of a fine is appealable and if a licensee prevails on their appeal, then DHS repays the monies with interest. *See id.* at 2600.263(a) ("If the home that is fined intends to appeal the amount of the penalty or the fact of the violation, the home shall forward the assessed penalty, not to exceed $500, to the Secretary for placement in an escrow account with the State Treasurer. A letter appealing the penalty shall be submitted with the assessed penalty. This process constitutes an appeal."); *id.* at § 2600.263(b) (providing for return of monies with interest upon successful appeal).

[22] The plaintiffs dispute the quality of the checks DHS performed. *See* Pls.' Br. in Opp'n to DHS Mot. at 23 (arguing review is more akin to "spellcheck" and cite check). While this arguably is an attempt to reargue that a predeprivation hearing is required, the court will construe the disputed facts in favor of the plaintiffs and analyze this prong as if the second-level review encompasses simply an administrative review for errors (*e.g.*, investigator describes a violation of one regulatory provision but erroneously cites to another provision instead). *See Augustin*, 897 F.3d at 150 ("The next factor, the risk of an erroneous deprivation, is somewhat difficult to assess on the present record, which comes to

any erroneous deprivation was lessened by DHS policies concerning operation during enforcement actions, DHS's decision not to issue fines, and the ability to seek expedited licensing review.

The risk of erroneous deprivation is also reduced because of certain procedural safeguards used during the review process and the ability to seek relief from any legal or factual errors in postdeprivation proceedings. According to DHS policy, the inspector first drafts the LIS, then the inspector submits it to the "first-line supervisor or regional director" for review, next, those revisions are incorporated and, finally, the supervisor conducts a final review of the LIS before transmitting it to the licensee. DHS Policies at 36, 37. Additionally, during the inspection process, inspectors are required to "[c]onfer about potential regulatory violations and ensure that at least two inspectors observe any serious regulatory violations." *Id.* at 36. The licensee also may dispute the findings in a LIS by "document[ing] disagreement with a finding." *Id.* at 39.

The risk of erroneous deprivation is further reduced because DHS "provides reasonable remedies to rectify legal errors by an administrative body[,]" namely, the opportunity both before and after DHS revokes a license to voice disagreement with the agency's findings. *Freidman*, 2015 WL 2337288, at *6. Prior to revocation, the plaintiffs admit that DHS allowed them to respond to the alleged violations in writing prior to the deprivation of their "regular" license and that they did so. Pls.' Resp. to DHS Facts at ¶ 53 (stating that "Saucon voluntarily submitted with its POC voluminous information rebutting DHS's 'factual findings' in the Violations Report, as it has the right to do so . . . ." (citation omitted)). This opportunity, as a matter of law, distinguishes the present case from situations where a party deprives a plaintiff of a protected interest without any notice or the chance to be heard. *Cf. Dee v. Borough of Dunmore*, 549 F.3d 225, 232 (3d Cir. 2008) ("Certainly, when an individual is not provided with any form of predeprivation process, as in this

---

us following a summary judgment. As such, the District Court was obliged to determine that there was no genuine dispute as to the facts on which it based its decision." (citation omitted)).

case, the risk of an erroneous deprivation of his constitutionally protected interest—*i.e.*, the second factor of the *Mathews* balancing—is heightened considerably."). After revocation, the plaintiffs can dispute the violations, *i.e.*, the basis for DHS's decision to revoke their license. While the plaintiffs argue they cannot challenge the underlying factual findings of DHS inspectors, the Commonwealth Court of Pennsylvania—the reviewing court for purposes of DHS licensing appeals—interpreted DHS's regulations as allowing a facility to "litigate and contest alleged violations at a revocation hearing based upon an unacceptable plan of correction, or at any hearing where violations, both past and present, form the underlying basis (or part of the basis) for nonrenewal or revocation." *Summit Acad.*, 2015 WL 8190829, at *9.[23] Accordingly, while DHS's review process may require greater credibility determinations and fact finding, the fact that the deprivation is insignificant coupled with the presence of procedures designed to prevent erroneous deprivation together weigh against requiring DHS provide a predeprivation hearing. *Cf. Freidman*, 2015 WL 2337288, at *6 ("Procedural due process requires that parties be given a meaningful opportunity to be heard; it does not provide unilateral entitlement to relief in the prompt time frame desired by the petitioner.")

Finally, the government's interest in quickly protecting a vulnerable population, the elderly, is paramount. Courts look to the regulatory purpose in determining the government's interest. *Town Court Nursing Ctr., Inc.*, 586 F.2d at 277. For example, in determining that a

---

[23] The plaintiffs argue that *Summit Acad. v. Dep't of Human Servs.*, No. 257 C.D. 2015, 2015 WL 8190829 (Pa. Commw. Dec. 7, 2015), is distinguishable because: (1) plaintiffs' license revocation is a greater "private interest" than the reputational interest asserted in *Summit Academy*; (2) plaintiffs' ability to contest a finding in a POC does not "preserve" their property interest because the interest here is revocation of a license and not merely an interest in name clearing; and (3) "due process requires more process than what is provided in connection with the POC." Pls.' Br. in Opp'n to DHS Mot. at 26, 27. The court finds these arguments unpersuasive because the two cases are strikingly similar, namely both cases: (1) involve DHS identifying a violation against a licensee and (2) allege due process violations which hinge on a licensee's inability to challenge DHS's violation finding *before* DHS revokes a facility's license. Therefore, while the private interest here may be greater because DHS actually revoked the plaintiffs' license, as described above, the plaintiffs fail to tip the scales of the *Mathews* test in their favor.

predeprivation hearing is not required prior to terminating a nursing home's Medicaid provider agreement, the Third Circuit, relying on a Second Circuit decision concerning the same subject matter, found the facility's need "incidental" because the fact "[t]hat a particular nursing facility cannot survive without Medicaid participation was certainly not Congress' foremost consideration in its creation of the Medicaid program." *Id.* (quoting *Case v. Weinberger*, 523 F.2d 602, 607 (2d Cir. 1975)). The same analysis applies here because the regulations applicable to the plaintiffs' personal care home license are not directed at ensuring the plaintiffs' revenue stream or reputation remains intact. Instead, "[t]he purpose . . . is to protect the health, safety and well-being of personal care residents." 55 Pa. Code § 2600.1(a). This governmental purpose is heightened where, as here, DHS never interrupted the plaintiffs' business operations because it never *permanently* revoked the plaintiffs' license—provisional or otherwise—without a hearing. *See Augustin*, 897 F.3d at 150 ("Although the filing of a lien is 'significant' enough to trigger the protections of the Due Process Clause, it remains a relatively limited interference with the landlords' property. An owner whose property is subject to a lien filed under the Lien Law may still use the property or sell it subject to the gas debts."). Even viewing the plaintiffs' asserted interest in their reputation and "regular" license together, such interests are "incidental" to that of the state's interest in ensuring the health and wellbeing of such a home's residents. *Town Court Nursing Ctr., Inc.*, 586 F.2d at 277; *see also Pioneer Aggregates, Inc.*, 540 F. App'x at 126 ("The private interest affected by official action in the instant case is Pioneer's ability to use its surface mining permit to reclaim the Laflin Quarry. However, despite this interest, we hold that the final factor of the *Mathews* test, the government's interest, weighs against requiring a hearing in every case where an application for clean source fill like Pioneer's was made.").

DHS's interest in not affording a predeprivation hearing is further heightened by its need to act quickly.[24] *See Fanti v. Weinstock*, 629 F. App'x 325, 330 (3d Cir. 2015) ("Here, the government had an interest in acting quickly to secure the documents that Fanti had failed to file with the Commonwealth, to ensure those documents were expeditiously filed, and to prevent any delays in the proper filing of additional vehicle registration documents."). For example, the regulations require notice to residents when a home has certain violations, or in drastic circumstances, rehousing and relocating residents. *See* 55 Pa. Code § 2600.266(c) (describing conditions upon which residents will be relocated from home), § 2600.268(a)–(d) (requiring notification within certain periods of time depending upon classification of violation and whether home timely corrected violation); *see also Nat'l Amusements Inc. v. Borough of Palmyra*, 716 F.3d 57, 62 (3d Cir. 2013) ("NAI's private interest in maintaining revenue from the continued operation of the Market is substantially outweighed by the overwhelming government interest in protecting the public safety from the danger posed by unexploded munitions."). If the state was required to conduct full evidentiary hearings prior to the downgrade of a license, it would allow delinquent personal care homes to delay remedying a violation at the expense of its residents' wellbeing. *See Dixon v. Love*, 431 U.S. 105, 114 (1977) ("Giving licensees the choice thus automatically to obtain a delay in the effectiveness of a suspension or revocation would encourage drivers routinely to request full administrative hearings. Far more substantial than the administrative burden, however, is the important public interest in safety on the roads and highways, and in the prompt removal of a safety hazard." (citations omitted)). Further, DHS's interest in prompt enforcement of personal care home regulatory violations is greater than a general government concern of delay in

---

[24] This is not an instance where a state has acted pursuant to "emergency powers" authorizing immediate deprivations. *See Elsmere Park Club, L.P.*, 542 F.3d at 420 (describing standard of review for procedural due process violations arising from invocation of "emergency powers").

enforcement or prosecution, because requiring an appeal before a personal care home is required

to correct violations would hinder the state's ability to actively police personal care homes at the

expense of the health and wellbeing of the home's elderly residents. *Cf. Application of United*

*States for Order Authorizing Installation of Pen Register or Touch-Tone Decoder & Terminating*

*Trap*, 610 F.2d 1148, 1157 (3d Cir. 1979) (rejecting government interest as insufficient when

government only had interest in executing tracing order "as soon as possible" without health and

safety concern). Therefore, on balance, the plaintiffs' private interest pales in comparison to DHS's

interest "in insuring that elderly and infirm nursing home patients are not required to stay in non-

complying homes longer than is necessary to assure that the" plaintiffs "had adequate notice and

opportunity to respond to charges of deficiencies." *Town Court Nursing Ctr.*, 586 F.2d at 278.

### ii.    Bias & Delay

The plaintiffs argue the DHS Defendants denied them due process because the

Investigators were biased against them and that DHS "stonewalled" their BHA appeal.[25] As to

bias, the court finds the plaintiffs' bias arguments unavailing for purposes of procedural due

process.[26] "[A] 'fair trial in a fair tribunal is a basic requirement of due process.' This applies to

---

[25] The plaintiffs argue that the court has already stated for purposes of procedural due process that they are entitled to "unbiased process." Pls.' Br. in Opp'n to DHS Mot. at 5. The plaintiffs misstate the court's previous order. In deciding the motion to dismiss, the court found that a procedure tainted by improper bias or motives could violate substantive, not procedural, due process. Doc. No. 21 at 4. The court's analysis with respect to procedural due process concerned only whether the procedures, as alleged at the time, were adequate to rectify the alleged "legal error." *Id.* at 3. Regardless, "[t]he Constitution does not require perfection at every stage of a process[,]" *Alvin v. Suzuki*, 227 F.3d 107, 119 (3d Cir. 2000), and, to the extent such biases infected the procedures applied, the plaintiffs' claim fails because DHS provides adequate procedures to challenge said improper findings or violations in the postdeprivation process. *See id.* ("[A]n allegation that initial stages of a process had been biased does not mean that the later processes will be biased as well."); *see also Valenti v. Cohen*, Civ. A. No. 88-6193, 1990 WL 55034, at *10 (E.D. Pa. Apr. 25, 1990) (holding no violation of procedural due process wherein plaintiffs argued Department of Public Welfare ("DPW") "misapplied the regulations governing Personal Care Boarding Homes" because "[t]he courts of Pennsylvania are empowered to correct any of DPW's actions which are manifest abuses of discretion, are contrary to law, or rest on findings of fact which are not supported by substantial evidence[]" (citing 2 Pa. C.S. § 754)), *aff'd*, 904 F.2d 697 (3d Cir. 1990). In fact, state courts have previously reviewed claims of bias or improper motive in licensing disputes. *See Lil Shining Stars, Inc. v. Dep't of Human Servs.*, 140 A.3d 83, 96 (Pa. Commw. 2016) (reviewing claim that department inspectors retaliated against owner for her complaints against department official).

[26] Generally, procedural due process violations based on bias arise in the context of a structural issue with the state's procedures, *i.e.*, adjudicator is also an investigator. However, "decision maker bias" can also provide a basis for a

28

administrative agencies which adjudicate as well as to courts." *Withrow v. Larkin*, 421 U.S. 35, 46–47 (1975) (citations omitted). Here, the plaintiffs argue the DHS Defendants denied them due process because (1) DHS, through Moskalczyk and Jones, conducted the investigation in a biased manner (*i.e.*, predetermined to find Saucon neglected Resident #1) and (2) Moskalczyk and Jones failed to follow agency policy by allowing their bias to impact the investigation.[27] Pls.' Br. in Opp'n to DHS Mot. at 6. In response, the DHS Defendants contend that, even if DHS conducted a biased investigation, there was no procedural due process violation because "a procedural due process analysis would look only at the facts relating to the process afforded to Plaintiffs to review and remedy those biased actions." DHS Reply Br. at 2. Further, the DHS Defendants argue that the cases relied upon by the plaintiffs—the majority of which are non-binding authority—are distinguishable because in those cases the "courts found that the processes available to remedy an arbitrary action were themselves biased."[28] DHS Reply Br. at 2. In the plaintiffs' sur-reply, they

procedural due process violation. *See United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.*, 787 F.2d 128, 137-38 (3d Cir. 1986) ("The district court in the case at bar did not confuse substantive and procedural due process but made an equally significant error by failing to distinguish between two kinds of procedural due process violations: those that arise from insufficient procedural safeguards and those that arise from decisionmaker bias."), *abrogated on other grounds by Concrete Pipe & Prods, of Cal, Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602 (1993).

[27] The plaintiffs argue that Moskalczyk and Jones were biased because: (1) Moskalczyk disliked Atiyeh (*e.g.*, believed Atiyeh was responsible for her computer problems, complained about her perceived mistreatment by Atiyeh to other DHS employees) and (2) Jones "instructed DHS inspectors to look for violations at Saucon" and investigated Atiyeh's complaints about certain DHS investigators in 2011. Pls.' Br. in Opp'n to DHS Mot. at 8, 9.

[28] In the present case, the court agrees with the DHS Defendants that the plaintiffs' claim based on bias must fail because, unlike the cases cited by the plaintiffs, DHS provides an impartial tribunal to review the license revocation. In support of their argument that bias resulted in a violation of their procedural due process rights, aside from citations to Supreme Court decisions for general propositions of law, the plaintiffs rely entirely on authority outside of the Third Circuit. *See* Pls.' Br. in Opp'n to DHS Mot. at 4 (citing to Seventh and Ninth Circuit decisions). Primarily, the plaintiffs rely on *Stivers v. Pierce*, 71 F.3d 732 (9th Cir. 1995) and *Ciechon v. City of Chicago*, 686 F.2d 511 (7th Cir. 1982) in support of their bias arguments. However, unlike the impartial BHA proceeding available to the plaintiffs, the review procedures afforded to plaintiffs in both *Stivers* and *Ciechon* were tainted by bias and those courts did not review whether postdeprivation procedures could remedy initial decisionmaker bias—presumably because the proceedings reviewed in *Stivers* and *Ciechon* were the reviewing tribunals and not the initial decisionmaker. *See Stivers*, 71 F.3d at 744, 745, 746–48 (involving licensing board decision wherein one member of board had pecuniary interest in outcome of proceeding and appeared to maintain personal animus towards licensee, licensing board treated plaintiff "unusually harsh" based on manner in which board conducted hearing, and potentially biased board member may have impacted entire process); *Ciechon*, 686 F.2d at 520 (stating that investigation was "incomplete" and City-employer "seemed bent from the outset upon limiting its investigation in order to justify discharging" plaintiff).

do not respond to the DHS Defendants' arguments that their bias claim fails because an impartial tribunal existed to hear their appeal, namely the BHA.

Here, authority cited by the plaintiffs fails to persuade the court because, even if bias infected the investigation process, claims that the first-line individual harbored bias against a plaintiff fail as a matter of law when the plaintiff "has not taken advantage of his right to a post-deprivation hearing before an impartial tribunal that can rectify any possible wrong committed by the initial decisionmaker." *Alvin*, 227 F.3d at 119 (quoting *McDaniels v. Flick*, 59 F.3d 446, 460 (3d Cir. 1995); *see also Washington v. Boder*, 762 F. App'x 133, 137 (3d Cir. 2019) (per curiam) (holding plaintiff entitled only to predeprivation process when claiming government officials evicted him without reason and based on "ultra vires scheme" that he was entitled only to postdeprivation process because "[t]he general rule is that government must provide procedural due process <u>before</u> depriving persons of their property. However, where the complained of conduct is random and unauthorized (so that state authorities cannot predict when such unsanctioned deprivations will occur), the very nature of the deprivation ma[kes] predeprivation process impossible, and postdeprivation process is all that is due." (citations and quotation marks omitted)); *Revell v. Port Auth. of N.Y., N.J.*, 598 F.3d 128, 138 (3d Cir. 2010) ("[T]he Supreme Court held that, when a state officer randomly and without authorization departs from established state procedures, the state need only provide post-deprivation procedures."). If Moskalczyk and Jones acted with bias or ill-will towards the plaintiffs and revoked their "regular license" based on facts they knew to be false, as the plaintiffs argue they did, then Moskalczyk and Jones would have intentionally acted in violation of DHS policy. *See* DHS Policies at 6 ("No member of the Bureau of Human Services Licensing will: . . . Apply regulations inconsistently because of arbitrariness, caprice, favoritism, nepotism, or personal bias"). Fortunately, DHS provides an adequate

postdeprivation procedure to challenge inspections that do not comply with the procedures or findings that are not supported by substantial evidence. *See Willard v. Pa. Soc. for the Prevention of Cruelty to Animals*, 525 F. App'x 217, 221 (3d Cir. 2013) ("[A] state provides constitutionally adequate procedural due process when it provides reasonable remedies to rectify a legal error by a local administrative body." (quoting *DeBlasio*, 53 F.3d at 597)). Thus, summary judgment is granted in favor of the DHS Defendants as to the plaintiffs' procedural due process claim based on bias.

As to improper delay, a "fundamental requirement of procedural due process is an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Wilkinson v. Abrams*, 627 F.2d 650, 665 (3d Cir. 1980) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). In the present case, the plaintiffs argue that DHS failed to adjudicate Saucon's appeal and thus has denied them postdeprivation due process, Pls.' Resp. to DHS Facts at ¶ 77; however, "delay alone does not create a *procedural* due process violation." *Midnight Sessions, Ltd.*, 945 F.2d at 682 (citation omitted). Instead,

> "[w]hen adequate post-deprivation procedures exist, a plaintiff must avail him or herself of those procedures to properly state a procedural due process claim." The adequacy of a post-deprivation hearing frequently depends on whether it is provided in a timely manner. No doubt that "[a]t some point, a delay in the post-termination hearing would become a constitutional violation." Further, "[w]here a particular process is inadequate, effectively blocked, or a sham, that process also would not provide the due process required by law."

*Yelland v. Abington Heights Sch. Dist.*, Civ. A. No. 3:16-2080, 2017 WL 6206289, at *4 (M.D. Pa. Dec. 8, 2017) (internal citations omitted). Importantly, unintentional delays and those not caused by the government do not cause a procedural due process violation. *Fanti v. Weinstock*, No. 3:11·CV·01077, 2014 WL 5586348, at *8 (M.D. Pa. Nov. 3, 2014), *aff'd*, 629 F. App'x 325 (3d Cir. 2015); *see also Yelland*, 2017 WL 6206289, at *7 (finding no violation where plaintiff

failed to "establish a delay *attributable only to defendants* and . . . that there was *no justification for the delay*." (emphasis added)).

Here, a review of the record shows that the BHA scheduled a telephonic pretrial hearing for July 16, 2015, roughly one month after the plaintiffs gave DHS notice of their intent to appeal their license downgrade, and a hearing on September 14, 2015.[29] BHA R. at ECF pp. 14, 17; Melley Decl., Ex. B at ECF pp. 9, 13, 14. Then the BHA stayed the hearing seven times and, aside from the first stay request, the plaintiffs (referred to as appellants in the BHA proceeding) requested each continuance. *See* BHA R. at ECF pp. 4, 6, 7, 8, 9, 11, 12. Notably, each order the ALJ issued which granted the requested stays, other than the first request in September 2015, required the *plaintiffs* to file a status report prior to its expiration. *Compare id.* at ECF p. 11 (staying appeal for 60 days and stating that "Appellant must provide a status update prior to 60 days"), *with id.* at ECF p. 12 (staying appeal for 30 days and stating that "Parties must provide a status update prior to 30 days").

While the plaintiffs argue that the DHS Defendants "deprived [them] of any post-deprivation process in connection with DHS's revocation of Saucon's regular license[,]" and that DHS denied "Saucon the opportunity to pursue its administrative appeal, which is a precondition of a state appeal[,]" Pls.' Resp. in Opp'n at 29 n.26, the plaintiffs do not dispute that they "did not 'tak[e] any action since commencing the present lawsuit to lift the stay or otherwise resume the BHA proceedings.'" Pls.' Resp. to DHS Facts at ¶ 77. While a delay of four years might be problematic if the BHA intentionally allowed the appeal to languish against the wishes of the plaintiffs, the plaintiffs cannot create a procedural due process violation based on delay they

---

[29] Recently, without a direct request from the plaintiffs, the BHA scheduled a hearing for April 30, 2019. *Id.* at ECF p. 5. However, the plaintiffs again requested a stay of their administrative proceeding and the BHA canceled the hearing on May 3, 2019. *Id.* at ECF p. 4. As of the last update provided by the parties, the BHA rescheduled the hearing for August 20, 2019. *Id.* at ECF p. 3.

caused. *See Fanti*, 2014 WL 5586348, at *7 ("Thus, excluding the time that Plaintiff's attorney was unavailable—a scheduling issue for which PennDOT cannot be held responsible . . . ."). Nonetheless, the court is constrained by the record provided by the parties, and the record does not include sufficient, and undisputed, factual evidence for the court to determine what occurred during the four-year period.[30] Thus, the court must leave the factual question for the jury and deny summary judgment as to the plaintiffs' procedural due process claim based on denial of access to postdeprivation procedures.

### iii. Stigma Plus

"[D]efamation is actionable under 42 U.S.C. § 1983 only if it occurs in the course of or is accompanied by a change or extinguishment of a right or status guaranteed by state law or the Constitution." *Clark v. Twp. of Falls*, 890 F.2d 611, 619 (3d Cir. 1989) (citation omitted). Thus, "to make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation *plus* deprivation of some additional right or interest. This has been referred to as the 'stigma-plus' test." *Dee*, 549 F.3d at 233–34 (citations omitted); *see Ersek v. Twp. of Springfield*, 102 F.3d 79, 83 n.5 (3d Cir. 1996) ("It is clear that to make out a claim for a violation of a liberty interest in reputation a plaintiff must show a stigma to his reputation plus some concomitant infringement of a protected right or interest.").

"To satisfy the stigma prong of the test, it must be alleged that the purportedly stigmatizing statements(s) [sic] (1) were made publicly and (2) were false." *Dee*, 549 F.3d at 235 (citation and internal quotation marks omitted). Whereas the "plus" prong requires an "alteration or

---

[30] The DHS Defendants provided limited information on the BHA proceeding with their motion for summary judgment and the record is devoid of several material facts, including: (1) whether the plaintiffs bore the burden of requesting a new hearing date; (2) the reason why DHS did not take any action to reschedule the hearing date or seek dismissal of the plaintiffs' action for their failure to prosecute the appeal; and (3) whether the plaintiffs complied with the ALJ's order and filed the most recently required status report.

extinguishment of 'a right or status previously recognized by state law.'" *Hill*, 455 F.3d at 237 (quoting *Paul v. Davis*, 424 U.S. 693, 711 (1976)). However, not all losses can satisfy the "plus" requirement. Instead, the "plus" must be "sufficiently tangible." *Good v. City of Sunbury*, 352 F. App'x 688, 691–92 (3d Cir. 2009) (listing previously identified, "tangible" losses as including "deprivation of the liberty to pursue a calling or occupation; an injury to plaintiff's reputation while in the exercise of her constitutional right to free speech; and a constructive discharge and consequent damage to plaintiff's ability to earn a living[]"(internal quotation marks and citations omitted)); *see also Mun. Revenue Servs., Inc. v. McBlain*, 347 F. App'x 817, 826 (3d Cir. 2009) (describing lost business opportunity as insufficient to support a reputation-based due process claim for purposes of "stigma plus"); *Sturm v. Clark*, 835 F.2d 1009, 1013 (3d Cir. 1987) (holding that "financial harm resulting from government defamation alone is insufficient to transform a reputation interest into a liberty interest" and requiring plaintiff to establish "alteration or extinguishment of some additional interest" (citations omitted)). Further, "psychological injury" such as "emotional trauma resulting from government defamation" is insufficient "to satisfy the 'plus' element of the 'stigma-plus' test." *Good*, 352 F. App'x at 692.

Here, it appears to be a disputed issue of material fact when DHS published the LIS.[31] The DHS Defendants argue that "no deprivation of a protected interest occurred until Plaintiffs' regular license was revoked." DHS Defs.' Br. at ECF p. 14 n.4. However, the plaintiffs argue that the DHS revoked the license and published the LIS simultaneously. Pls.' Resp. in Opp'n to DHS at 31, 33. Thus, the court denies summary judgment because disputed issues of material fact preclude the court from determining whether the plaintiffs can satisfy the "plus" requirement.

---

[31] The court is also constrained by the DHS Defendants' cursory treatment of this issue. *See* DHS Defs.' Br. at ECF p. 14 n.4 (discussing "stigma plus" claim in one paragraph).

## 2.       Equal Protection

A prima facie claim for a violation of the Equal Protection Clause requires a plaintiff to establish: "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill*, 455 F.3d at 239. "Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'" *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). When a defendant moves for summary judgment, a plaintiff "must produce evidence of similarly situated" persons "that were treated differently" and cannot rely on allegations or conclusory assertions of disparate treatment to satisfy their burden. *See Young v. Twp. of Coolbaugh*, 276 F. App'x 206, 209 (3d Cir. 2008) ("Because Young has not pointed to a single proposal that was similarly situated to his proposal and which was treated differently, summary judgment was properly entered for the Township."); *Adams Parking Garage, Inc. v. City of Scranton*, 33 F. App'x 28, 32 (3d Cir. 2002) ("[B]ecause [appellants] presented no evidence that others, who were similarly situated, were treated differently, the district court properly entered summary judgment as to appellants' equal protection claims.").

In the present case, the court need only address the first element of the plaintiffs' equal protection claim—whether Miller, Rowe, Jones, or Moskalczyk treated the plaintiffs differently from those similarly stated—because it is dispositive.[32] The plaintiffs do not present any evidence of similarly situated personal care homes that suffered violations similar to theirs and received different treatment. Instead, they assert their equal protection claim can proceed without identifying similarly situated homes and argue, without identifying any other personal care homes

---

[32] The parties briefly address whether DHS intentionally treated the plaintiffs differently. DHS Defs.' Br. at 6; Pls.' Br. in Opp'n to DHS Mot.at 49.

with specificity, that DHS engaged in unprecedented behavior by interfering with the Department of Aging's investigation and deciding to initiate an enforcement action earlier in their case than in others. Pls.' Br. in Opp'n to DHS Mot. at 47, 48. However, these arguments miss the mark because the plaintiffs must identify specific entities similar to Saucon "in all relevant respects." *Startzell*, 533 F.3d at 203. Instead, the plaintiffs merely rely on instances which involve their own interactions with DHS.[33] *See, e.g.*, *Chambers ex rel. Chambers*, 587 F.3d at 197 (affirming grant of summary judgment against plaintiffs on equal protection claim when plaintiffs relied on "no more than a conclusory statement" that their child was treated "differently than other disabled children" by school district); *Highway Materials, Inc. v. Whitemarsh Twp.*, 386 F. App'x 251, 259 (3d Cir. 2010) (affirming grant of summary judgment on equal protection claim and comparing government's zoning decision as to plaintiff's parcel with decisions regarding other parcels); *Matsey v. Westmoreland Cty.*, 185 F. App'x 126, 131 (3d Cir. 2006) (affirming grant of summary judgment on equal protection claim by reviewing whether plaintiff was similarity situated to identified employees). Therefore, the court grants summary judgment in favor of the DHS Defendants on the plaintiffs' equal protection claim.

### 3.     First Amendment Retaliation

As to the plaintiffs' claim for First Amendment retaliation, a prima facie case of First Amendment retaliation requires: "(1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action. The first factor is a question of law; the second factor is a question of fact." *Hill*, 455 F.3d at 241 (citations omitted). Here, disputed issues of material fact preclude summary judgment,

---

[33] The court also finds the plaintiffs' arguments related to the Department of Aging investigation irrelevant. Any claim that the Department of Aging treated them differently because DHS "interfered" with the Department of Aging's investigation and allegedly did not do so in other investigations is irrelevant to whether DHS treated the plaintiffs differently than other personal care homes in its own investigation.

including when the plaintiffs engaged in the allegedly protected activity and the specific instances of "retaliation" related to the allegedly protected activity. Thus, the court denies summary judgment and will allow DHS to re-raise all arguments related to the plaintiffs' First Amendment claim at trial.[34]

### 4. Civil Conspiracy

The plaintiff alleges that the At Home Defendants, Jones, and Moskalczyk conspired to violate their civil rights. Compl. at 18. "To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 293–94 (3d Cir. 2018) (citation omitted). "Although not an agent of the state, a private party who willfully participates in a joint conspiracy with state officials to deprive a person of a constitutional right acts 'under color of state law' for purposes of § 1983." *Abbott v. Latshaw*, 164 F.3d 141, 147–48 (3d Cir. 1998) (citations omitted).

Here, the plaintiffs' claim fails because a conspiracy is cognizable under section 1983 only if the parties conspire to deprive the plaintiffs of a *federal* constitutional or statutory right. *See Rink v. Ne. Educ. Intermediate Unit 19*, 717 F. App'x 126, 141 (3d Cir. 2017) ("There can be no civil conspiracy to commit an unlawful act under § 1983 where the plaintiff has not proven a deprivation of a constitutional or federal statutory right or privilege."). The plaintiffs instead argue that the object of the conspiracy was to deprive them of their "regular" license, and they fail to connect the alleged conspiratorial actions to their asserted constitutional violations.[35] *See, e.g.*,

---

[34] The court will defer ruling on whether the plaintiffs' activities constituted protected activities for purposes of the First Amendment until fuller development of the record at trial.

[35] The closest the plaintiffs reach in connecting the alleged conspiracy to a constitutional violation is in their response to the At Home Defendants' statement of material facts; however, merely arguing that the "regular license" is a protected property interest under the Fourteenth Amendment does not suffice to present evidence of a conspiracy to deprive the plaintiffs of said license without due process. *See* Unredacted Pls.' Resp. to the Statement of Undisputed Facts of At Home, Inc. d/b/a At Home Health Service and At Home Health and Hospice and Patrick Stonich at ¶ 46

Compl. at ¶ 99 ("Defendants Stonich and At Home acted in concert and agreement with Defendants Jones and Moskalczyk to unlawfully deprive Saucon Valley Manor of its regular personal care license."); Unredacted Resp. of Pls. Saucon Valley Manor, Inc. and Nimita Kapoor-Atiyeh in Opp'n to the Mot. for Summ. J. of Defs. At Home, Inc. and Patrick R. Stonich ("Pls.' Resp. to At Home Defs.' Mot.") at 14 ("In sum, powerful evidence supports the clear inference that, despite the At Home Defendants' protestations otherwise, the At Home Defendants and the DHS Defendants had a 'meeting of the minds' and, in furtherance of their objective to harm Saucon, DHS revoked Saucon's regular license."), Doc. No. 109. Even if the defendants conspired to deprive the plaintiffs of their license, the plaintiffs cannot sustain a cause of action for section 1983 civil conspiracy unless the object of the conspiracy was to deprive them of their license without due process of law, equal protection, or to retaliate against them for their First Amendment activities.[36] For example, the plaintiffs' conspiracy cause of action cannot be predicated on their alleged procedural due process violations because, by merely submitting allegedly false complaints, the At Home Defendants did not "conspire" with DHS to revoke the plaintiffs' regular license without due process. *Cf. Abbott*, 164 F.3d at 147–48 (holding plaintiff stated claim for section 1983 civil conspiracy to violate his due process rights between state actors, constable and

---

("More precisely, in the instant action, Plaintiffs' allege that they suffered an injury of constitutional dimensions—*i.e.*, the deprivation of their property interest in Saucon's regular personal care home license—upon the revocation of that license, and at that time their Section 1983 claims accrued."), Doc. No. 106.

[36] The plaintiffs' reliance on *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970), a case involving racial discrimination, is misplaced. Pls.' Resp. to At Home Defs.' Mot. at 11. In *Adickes*, the defendant refused to serve the plaintiff, a white woman attempting to eat lunch with her African American students. *Id.* at 149. After she left the restaurant, a police officer who was observing the scene inside arrested the plaintiff for "vagrancy." *Id.* at 149–50. The plaintiff sued under section 1983 alleging that the restaurant and the police conspired "(1) to deprive (her) of her right to enjoy equal treatment and service in a place of public accommodation; and (2) to cause her arrest on the false charge of vagrancy." *Id.* (internal quotation marks omitted). The court found disputed issues of material fact precluded summary judgment, namely that affidavits from key witnesses (including the police officer in the restaurant and the waitress who denied service) either were simply not filed or notably excluded discussion of key events. *Id.* at 157. While there are many distinctions between the factual scenario present in *Adickes* and the present case, the most important distinction is that the plaintiff in *Adickes* argued that the agreement centered on a scheme to violate her federal constitutional rights—not merely to take adverse action against her.

police officers, and private party, his ex-wife, by alleging state actors agreed to help ex-wife obtain plaintiff's vehicle by ordering plaintiff to immediately relinquish possession of his vehicle or be arrested). The fact that the At Home Defendants allegedly interfered with plaintiffs' license by filing complaints is at best, a tortious interference with plaintiffs' business, and not a civil conspiracy predicated on the violation of a federal right.[37] Therefore, summary judgment is granted in favor of the moving defendants.

## III. CONCLUSION

For the reasons stated above, the court grants summary judgment as to the plaintiffs' claims for procedural due process premised upon the failure to provide predeprivation procedures and bias, equal protection, and civil conspiracy. The court denies summary judgment as to the plaintiffs' claims for denial of postdeprivation procedures due to delay and First Amendment retaliation.

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.

---

[37] A section 1983 civil conspiracy requires a predicate federal violation. *Glass v. City of Phila.*, 455 F. Supp. 2d 302, 359 (E.D. Pa. 2006). Thus, the court's holding above that the plaintiffs' equal protection claim fails as a matter of law precludes the plaintiffs from using it as the anchor violation for their civil conspiracy claim. *See Watlington on behalf of FCI Schuylkill Afr. Am. Inmates v. Reigel*, 723 F. App'x 137, 140 (3d Cir. 2018) (per curiam) ("The conspiracy claim was premised on the First Amendment retaliation claim, and because that underlying claim was properly dismissed, the conspiracy claim had to be dismissed as well."). As to the plaintiffs' remaining First Amendment claim, they do not argue that the At Home Defendants conspired with Miller, Rowe, Jones, and/or Moskalczyk to retaliate against them for engaging in protected speech. *Cf. Downs v. Borough of Jenkintown*, Civ. A. No. 18-4529, 2019 WL 1383802, at *8 (E.D. Pa. Mar. 26, 2019) (holding that plaintiff stated claim for section 1983 civil conspiracy predicated on First Amendment retaliation wherein plaintiff pleaded that local zoning officials "(1) worked in combination, with the common purpose to punish plaintiffs for exercising their First Amendment rights (2) that they engaged in the overt act of bringing false Zoning Code violations against plaintiffs, and (3) that plaintiffs suffered legal damage in expenses exerted to defend against such claims" and noting plaintiffs sufficiently identified the "object of the conspiracy—to punish plaintiffs for exercising their First Amendment rights . . ." based on facts plead (internal citations omitted)).